*State of Maryland v. Rony Galicia*
No. 5, September Term 2021

**Criminal Procedure – Constitutional Law – Confrontation Clause.**  In a joint trial of several defendants charged with murder, the trial court admitted evidence of an out-of-court statement of a non-testifying defendant solely against that defendant.  The witness who described that statement testified that the defendant-declarant had said that "they" had shot the victims.  The admission of that out-of-court confession of the non-testifying defendant including the generic plural "they" did not violate the rights of a co-defendant under the Confrontation Clause when the co-defendant's position at trial was that there were multiple shooters but that he was not one of them.

**Criminal Procedure – Cross-Examination.**  A trial court has broad discretion to limit cross-examination when the probative value of the evidence sought to be elicited is outweighed by the potential for confusing the issues or misleading the jury, even if the evidence is arguably admissible under a hearsay exception.

**Evidence – Hearsay – Exception for Statement Against Declarant's Interest.**  Under Maryland Rule 5-804(b)(3), the burden for establishing the admissibility of a hearsay statement against the declarant's interest is the same whether the statement is introduced by the State or by a criminal defendant.

**Evidence – Expert Testimony – Adjustment of Location Tracking Function of a Mobile Device.**  Under Maryland Rule 5-701 *et seq*., a witness need not be qualified as an expert to testify that a user of a mobile phone or similar device can adjust the function that tracks and collects location data.  When a court considers whether testimony is beyond the knowledge of the average person, the critical question is not whether the average person is already knowledgeable about a given subject, but whether it is within the range of perception and understanding of the average person.

IN THE COURT OF APPEALS

OF MARYLAND

No. 5

September Term, 2021

---

STATE OF MARYLAND

v.

RONY GALICIA

---

\*Getty, C.J.,
\*McDonald
Watts
Hotten
Booth
Biran
Raker, Irma S. (Senior Judge,
Specially Assigned),
    JJ.

---

Opinion by McDonald, J.
Watts and Raker, JJ., dissent.

---

Filed: June 27, 2022

\*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Md. Constitution, Art. IV, §3A, they also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In June 2017, on the eve of their high school graduation, two teenagers were ambushed and shot multiple times while they sat in a parked car in a cul-de-sac in Montgomery County. Four men, including Respondent Rony Galicia, were charged and ultimately convicted of the murders in three separate trials. The Court of Special Appeals reversed Mr. Galicia's conviction on the basis of two evidentiary issues that arose during his trial. We reach a different conclusion on both of those issues.

The first issue is whether the trial court abused its discretion when it declined to allow Mr. Galicia to cross-examine one of the State's witnesses about out-of-court statements allegedly made by one of his co-defendants. We hold that the State's direct examination of that witness did not prejudice Mr. Galicia such that it triggered a right to elicit otherwise inadmissible evidence on cross-examination. We also hold that, even if the particular statement Mr. Galicia sought to introduce – in which one of his co-defendants allegedly told the co-defendant's girlfriend that his younger brother, also a co-defendant, had "shot them guys, too" – could fit within a hearsay exception for a statement against the *declarant's* penal interest, the trial court did not abuse its discretion in limiting the proposed cross-examination.

The second issue arises from a prosecution witness' trial testimony about the tracking of Mr. Galicia's location on the evening of the murders through data generated by cell phones and other electronic devices. That issue is whether a witness must be qualified as an expert to testify that a user of a smartphone may turn off the location tracking feature of an application on the phone. We hold that a user's ability to adjust the location tracking

feature of a smartphone is within the understanding of the average lay person and that a witness whose testimony referred to that ability did not have to be qualified as an expert.

# I

## Background

### A.  The Murders

Late on the evening of June 5, 2017, two high school seniors who were scheduled to graduate the next day from their school in Germantown were murdered while they sat in a car parked in a cul-de-sac in Montgomery Village.  One of the teenagers, Shadi Najjar, had an extra ticket to the graduation ceremony, hoped to sell it, and had made an arrangement over Snapchat[1] to meet the supposed purchaser at that location.  His friend, Artem Ziberov, waited with him.  Mr. Najjar was shot three times in the head at close range and once in the thigh.  Mr. Ziberov was shot at least 10 times in the neck, chest, back, and arms.  Ballistic and forensic evidence established that multiple guns were used in the attack.

### B.  The Charges and the Trial of Mr. Galicia

Four individuals were arrested and charged with the murders:  Jose Ovilson Canales-Yanez, Edgar Garcia-Gaona, his younger half-brother Roger Garcia, and Mr. Galicia.[2]  All four were convicted in the Circuit Court for Montgomery County of various

---

[1] Snapchat is a social media platform that provides free messaging and photo and video sharing for its users.

[2] At the trial of this case, and in some of the related appellate filings, the defendants were frequently identified by first names or nicknames – *i.e.*, Mr. Canales-Yanez was referred to as "Ovilson" or "O"; Mr. Garcia-Gaona as "Edgar"; Mr. Garcia as "Roger" or "Johann"; and Mr. Galicia as "Rony" or "Ru."

charges related to the murders as a result of three separate trials. This appeal arises out of a trial of Mr. Galicia, Mr. Garcia-Gaona, and (for a time) Mr. Garcia.[3]

This appeal involves two discrete evidentiary issues that arose during the State's case with respect to Mr. Galicia. Mr. Galicia has not disputed that the State's evidence presented at trial, if believed by the jury, was sufficient to support his convictions. There is no need to review that evidence in detail to address the issues before us. To provide some context for the two specific issues before us, we describe briefly the theory of the State's case and of Mr. Galicia's defense.

1.    The Prosecution's Theory of the Case

In its opening statement and closing arguments, the prosecution laid out its theory of the case: On December 14, 2016, Mr. Canales-Yanez's pregnant wife had arranged to

---

[3] Mr. Canales-Yanez opted for a bench trial, while the other three defendants elected trial by jury.

At his bench trial, Mr. Canales-Yanez was convicted of two counts of first-degree murder, one count of conspiracy to commit murder, four firearms offenses, and armed robbery. Those convictions were affirmed on appeal. *Canales-Yanez v. State*, 244 Md. App. 285 (2020), *aff'd*, 472 Md. 132 (2021).

At the jury trial, Mr. Garcia-Gaona was convicted of conspiracy to murder Mr. Najjar, two counts of first-degree murder, two counts of use of a firearm in the commission of a felony, and armed robbery of Mr. Najjar – the same charges on which Mr. Galicia was found guilty at that trial. Mr. Garcia-Gaona's convictions were affirmed on appeal. *Garcia-Gaona v. State*, 2021 WL 130513 (Md. Ct. Spec. App. Jan. 14, 2021), *cert. denied*, 474 Md. 725 (2021).

Mr. Garcia initially went to trial with his older brother and Mr. Galicia, but a mistrial was declared as to him after his attorney fell ill mid-trial and was unable to continue. Mr. Garcia was later convicted of two counts of second-degree murder and two firearms charges in a separate trial. The Court of Special Appeals affirmed those convictions. *Garcia v. State*, 253 Md. App. 50 (2021). This Court granted a writ of *certiorari* to review an issue in that case unrelated to Mr. Galicia's appeal here. The Court has heard argument in Mr. Garcia's appeal, which remains pending.

3

sell marijuana to Mr. Najjar. At the agreed-upon time for the transaction, Mr. Najjar drove up to her, reached through the car window, grabbed the bag of marijuana from her hand, and drove off without paying. In the process, he ran over her foot. As a result, she was hospitalized; her unborn child apparently was unharmed. Later that day, Mr. Canales-Yanez repeatedly attempted to reach Mr. Najjar by phone, without success.

According to the prosecution, Mr. Canales-Yanez decided to take revenge on Mr. Najjar for the injury to his wife. He enlisted his friends, Mr. Garcia-Gaona and Mr. Galicia, in that effort. Their opportunity arose in June 2017 when Mr. Najjar advertised over Snapchat that he had an extra ticket to his high school graduation the next day that he would be willing to sell. According to the prosecution, the conspirators obtained the assistance of Mr. Garcia-Gaona's brother, Mr. Garcia, who had recently graduated from the same school as Mr. Najjar. Mr. Garcia communicated with Mr. Najjar over Snapchat on June 5, 2017, and arranged to meet at a cul-de-sac in Montgomery Village to purchase the graduation ticket.

Mr. Ziberov accompanied Mr. Najjar that evening. Mr. Najjar sent a message to Mr. Garcia via Snapchat that he had arrived at the agreed-upon location. At approximately 10:30 p.m. that evening, according to the prosecution, the conspirators arrived and shot Mr. Najjar and Mr. Ziberov with three, or possibly four, different guns as the two teenagers waited in the car for the rendezvous. Mr. Garcia-Gaona destroyed Mr. Najjar's cell phone in an apparent effort to eliminate evidence of the victim's Snapchat communications with his brother.

4

The State called 43 witnesses and introduced more than 500 exhibits. In addition to the evidence that is the subject of this appeal, the State presented, among other things, the testimony of Victoria Kuria, Mr. Garcia's then-girlfriend, who said that she had observed Mr. Galicia and the other defendants in the Garcia family trailer on the night of the murders; ballistics and forensic evidence linking the defendants in different ways to the crime (including DNA evidence that linked Mr. Galicia to shell casings at the scene of the shooting); recorded jail calls between Mr. Garcia-Gaona and Mr. Galicia, a police interview of Mr. Galicia while he was in custody on other charges; and historical cell site analysis concerning locations of the defendants' cell phones.

### 2. Mr. Galicia's Theory of the Case

In the defense's opening statement and closing argument, Mr. Galicia's attorney told the jury that, although she agreed with the State that Mr. Canales-Yanez, Mr. Garcia-Gaona, and Mr. Garcia had participated in the murders, Mr. Galicia was not part of the conspiracy. The defense questioned the credibility of Ms. Kuria; questioned the accuracy of forensic evidence that connected Mr. Galicia to the crime; and presented records related to Mr. Galicia's Xbox to support an inference that Mr. Galicia had spent that evening in his room watching a movie on that device. Four character witnesses testified on his behalf. Mr. Galicia elected not to testify in his own defense.

### 3. The Verdict

On November 19, 2018, the jury returned a verdict finding Mr. Galicia guilty of two counts of first-degree premeditated murder, two counts of first-degree felony murder, conspiracy to commit murder, two counts of use of a firearm in the commission of a felony,

5

and armed robbery. On January 22, 2019, the Circuit Court sentenced Mr. Galicia to consecutive terms of life imprisonment without the possibility of parole on the two first-degree murder convictions, a concurrent life term on the conspiracy count, and consecutive terms totaling 60 years' incarceration on the firearms and robbery counts.

4.      Mr. Galicia's Appeal

Mr. Galicia filed a timely appeal. In an unreported opinion, the Court of Special Appeals reversed his convictions and ordered a new trial. *Galicia v. State*, 2021 WL 130513 (Md. Ct. Spec. App. Jan. 14, 2021).[4] The intermediate appellate court held that: (1) the trial court improperly restricted Mr. Galicia's counsel from questioning a prosecution witness about out-of-court statements allegedly made by his co-defendant, Mr. Garcia-Gaona, that were impliedly exculpatory as to Mr. Galicia and that should have been admitted under an exception to the hearsay rule for statements against penal interest; and (2) the trial court erred when it allowed a lay witness to testify that a cell phone user such as Mr. Galicia has the ability to turn off location tracking associated with the user's Google accounts – testimony that offered a potential explanation for a gap in the location tracking data associated with Mr. Galicia's Google accounts that included the date of the murders. The State filed a petition for a writ of *certiorari*, which we granted to review the two grounds on which the intermediate appellate court reversed Mr. Galicia's convictions.

---

[4] As noted earlier, that opinion also affirmed the convictions of Mr. Garcia-Gaona resulting from the same trial. *See* footnote 3 above.

6

## II

## Hearsay and the Scope of Cross-Examination

The first issue before us arises from the trial judge's refusal to allow Mr. Galicia's attorney to cross-examine a prosecution witness about out-of-court statements that his co-defendant Mr. Garcia-Gaona allegedly made to her. Counsel sought to pursue that line of questioning after the State had elicited that witness' testimony about other out-of-court statements by Mr. Garcia-Gaona and had introduced those statements solely against Mr. Garcia-Gaona.

Before we describe the trial proceedings and analyze the issue, it is useful to review briefly the general principles governing the admissibility of hearsay and the two pertinent exceptions to the hearsay rule, as well as principles governing the scope of cross-examination by defense counsel in a criminal case. Finally, we summarize the standards that an appellate court applies in reviewing a trial court's rulings on such issues.

### A. Relevant Legal Principles

#### 1. The Hearsay Rule and its Exceptions

*Hearsay generally*

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial …, offered in evidence to prove the truth of the matter asserted." Maryland Rule 5-801(c). While a "statement" for purposes of this definition is generally an oral or written assertion, it may also consist of nonverbal conduct, if intended by the

declarant as an assertion. Maryland Rule 5-801(a). The "declarant" is the person who made the out-of-court statement, but who is not testifying about the statement at trial.

As a general rule, hearsay is not admissible in evidence at trial. Maryland Rule 5-802. As the Supreme Court has explained, the theory underlying this general rule is "that out-of-court statements are subject to particular hazards. The declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener. And the ways in which these dangers are minimized for in-court statements – the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and, most importantly, the right of the opponent to cross-examine – are generally absent for things said out of court." *Williamson v. United States*, 512 U.S. 594, 598 (1994).

The general principle that hearsay is inadmissible, however, is subject to many exceptions that are compiled in several rules. *See* Maryland Rules 5-802.1 through 5-804. Two related, but quite distinct, exceptions are pertinent to this appeal: (1) an exception for out-of-court statements by a party-opponent; and (2) an exception for out-of-court statements that are "against the penal interest" of the declarant.

*Statement by Party-Opponent*

A commonly invoked exception to the hearsay rule pertains to a "statement by a party-opponent." That exception encompasses an out-of-court statement that was made by

8

an opposing party and that is offered in evidence against that party. Maryland Rule 5-803(a).[5]

Such a statement is admissible even if the declarant – *i.e.*, the party-opponent – is available to testify. In addition, there is no requirement that the statement be adverse to the interests of the declarant. There is occasionally confusion on that score, as this exception was often referred to at common law as an exception for "admissions" by a party-opponent. *See* Joseph F. Murphy, Jr., et al., Maryland Evidence Handbook (5th ed. 2020) §805 ("Admissions"). Of course, it is often the case that such a statement will be favorable to the party who seeks to introduce it and therefore adverse to the party-opponent who made the statement – that is why the proponent seeks to introduce it in the first place. But it is not a necessary element of this exception.

In a criminal prosecution, it is common for the prosecution to introduce, on the basis of this exception, prior out-of-court statements of a defendant – the prosecution's party-

---

[5] The rule provides, in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> (a) Statement by party-opponent. A statement that is offered against a party and is:
> (1) The party's own statement, in either an individual or representative capacity; ….

Maryland Rule 5-803(a)(1). Other subsections of the rule concern how statements made by others may be attributed to a party-opponent for purposes of the rule. Maryland Rule 5-803(a)(2)-(5). This rule is based on a similarly-worded provision in the Federal Rules of Evidence, except that the federal rule defines an out-of-court statement by a party-opponent as non-hearsay rather than hearsay that is admissible under an exception. *See* Federal Rule of Evidence 801(d)(2).

opponent. For example, the prosecution may introduce prior statements of a defendant made to the police, to friends, or to strangers. In fact, it is so common for the State to introduce prior statements of a defendant, and this exception is so well understood, that frequently no objection is made that requires explicit invocation of the exception. Generally, such an out-of-court statement is relevant because it connects the defendant in some way to the crimes charged in the case. But, as indicated above, the statement need not be against the defendant's interest on its face, so long as it is the defendant who allegedly made it. *See* Lynn McLain, Maryland Evidence: State and Federal (Aug. 2021 update), §801(4):1. Such statements are admissible by the State against the defendant who made the out-of-court statement, subject to the bounds of relevance,[6] and other factors that affect a court's discretion whether to admit evidence.[7]

The admission of an out-of-court statement of a defendant in a criminal case becomes more complicated in a multi-defendant trial. The hearsay statement of one defendant does not qualify as a statement by a party-opponent as to other defendants and therefore is not admissible by, or against, a co-defendant on the basis of that exception. *See Payne v. State*, 440 Md. 680, 707-10 (2014). Moreover, if a defendant's out-of-court statement inculpates a co-defendant, the admission of the statement may raise an issue

---

[6] *See* Maryland Rule 5-402 (relevant evidence generally admissible).

[7] *See* Maryland Rule 5-403 (relevant evidence may be excluded on grounds of prejudice, confusion, or waste of time).

under the Confrontation Clauses of the federal and State constitutions,[8] as a limiting instruction that tells the jury to compartmentalize the statement as to one defendant may not always be effective. *See Bruton v. United States*, 391 U.S. 123 (1968) (introduction of confession of non-testifying defendant that also implicates co-defendant violates confrontation right of co-defendant). However, the Confrontation Clauses are not implicated by the admission of the out-of-court statement against the defendant who allegedly made it, as that defendant cannot complain of an inability to cross-examine the declarant. McLain, Maryland Evidence, §801(4):1(c). To deal with potential issues under the Confrontation Clauses, a trial court typically requires the testimony or document containing the out-of-court statement to be redacted to remove a specific reference to a co-defendant[9] and instructs the jury to consider that statement solely as to the defendant who allegedly made it.[10]

---

[8] United States Constitution, Sixth Amendment; Maryland Declaration of Rights, Article 21. This Court has recently held that Article 21 and the Sixth Amendment Confrontation Clause are not completely coextensive. *See Leidig v. State*, 475 Md. 181 (2021). However, *Leidig* addressed the question of whether an out-of-court statement was "testimonial," a distinction first outlined by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004). That distinction is not relevant to the issue currently before the Court.

[9] *See Richardson v. Marsh*, 481 U.S. 200 (1987). A redaction must be effective and not point directly to the non-confessing co-defendant. *See Gray v. Maryland*, 523 U.S. 185 (1998).

[10] The pattern jury instructions developed by a committee of the Maryland State Bar Association ("MSBA") include an example of such an instruction. *See* MSBA, Maryland Criminal Pattern Jury Instructions (2d ed. 2012), MPJI-Cr 3:09 ("Evidence Applicable to Only One Defendant – Jury to Limit Consideration").

*Statement Against Penal Interest*

A separate exception to the general principle that hearsay is inadmissible applies to an out-of-court statement that would potentially expose the declarant to criminal prosecution. Maryland Rule 5-804(b)(3). In the words of the rule, this exception applies to a statement "which … at the time of its making … so tended to subject the declarant to … criminal liability … that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true …. A statement tending to expose the declarant to criminal liability and offered in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.*[11]

The rationale for the exception is that there are circumstantial guarantees of sincerity and accuracy when one makes a statement adverse to one's own interests. *State v. Standifur*, 310 Md. 3, 11 (1987); McLain, Maryland Evidence, §804(3):1(a). As a shorthand, this is often referred to as the exception for a "statement against penal interest." *See, e.g., Gray v. State*, 368 Md. 529 (2002).

This exception is narrower than the exception for a statement by a party-opponent in several respects. First, a statement against penal interest is admissible only if the declarant is unavailable as a witness – a condition that does not apply to the exception for

---

[11] This rule is substantially similar to Federal Rule of Evidence 804(b)(3). Like the federal rule, it also encompasses other types of statements against the interest of the declarant – *e.g.*, statements that are against the speaker's "pecuniary or proprietary interest," that would subject the speaker to civil liability, or that would render invalid a claim by the speaker against another. Maryland Rule 5-804(b)(3). Only the portion of the rule concerning statements against penal interest pertains to this case.

an out-of-court statement by a party-opponent. Second, the content of the statement must fit the description of the rule – *i.e.*, it must be so adverse to the declarant's interest that a reasonable person would not have made it unless it was true. That condition does not apply to the exception for a statement by a party-opponent. Finally, in a criminal case, there must be "corroborating circumstances" that indicate that the out-of-court statement is trustworthy; there is no corroboration requirement for a statement by a party-opponent.

If it happens that the out-of-court statement in question was made by an adverse party in the case, this exception is subsumed within the broader exception outlined above for statements by a party-opponent. *See* McLain, Maryland Evidence, §804(3):1(a). Thus, in a criminal case, the prosecution is unlikely to rely on this exception in introducing an out-of-court statement by a defendant, as the statement would also be readily admissible against that defendant under the broader exception.

*Summary*

As noted above, these two exceptions to the general hearsay rule are quite distinct, but they are often confused. *See Aetna Casualty & Surety Co. v. Kuhl*, 296 Md. 446, 456 n.2 (1983) (noting the "all too common error of failing to distinguish between" the two hearsay exceptions in a case where both exceptions were invoked).

An out-of-court statement is admissible as a statement by a party-opponent if it is introduced (1) by a party adverse to declarant (2) against the declarant and if (3) it otherwise satisfies the threshold general rules concerning admission of evidence.

An out-of-court statement is admissible as a statement against penal interest if (1) the declarant is unavailable, (2) the statement is genuinely adverse to the declarant's penal

13

interest, and (3) corroborating circumstances clearly indicate the trustworthiness of the statement.

2.      Scope of Cross-Examination and the Confrontation Clauses

As noted above, the Confrontation Clauses guarantee a defendant in a criminal case the right to cross-examine a witness who provides evidence against the defendant. *Pointer v. Texas*, 380 U.S. 400, 404 (1965). Accordingly, a trial court must allow defense counsel a "threshold level of inquiry" in questioning the State's witnesses. *Peterson v. State*, 444 Md. 105, 121-22 (2015). Once that threshold is met, the trial court has considerable discretion to limit the scope of cross-examination to prevent, among other things, "prejudice, confusion of the issues, and inquiry that is repetitive or only marginally relevant." *Manchame-Guerra v. State*, 457 Md. 300, 309 (2018) (quotation marks and citation omitted). For example, under Maryland Rule 5-611(b)(1), "cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." *See also* Maryland Rule 5-616 (impeachment and rehabilitation of witnesses). "Within that limit a defendant should be free to cross-examine in order to elucidate, modify, explain, contradict, or rebut testimony given in chief." *Smallwood v. State*, 320 Md. 300, 307 (1990).

3.      Standards of Appellate Review

With respect to the admission or exclusion of evidence, an appellate court applies the abuse of discretion standard to a trial court's assessment whether evidence is relevant to an issue in the particular case, or whether its probative value is substantially outweighed

14

by the danger of unfair prejudice, confusion, or waste of time. *See, e.g., Dejarnette v. State*, 478 Md. 148, 175 (2022); *Merzbacher v. State*, 346 Md. 391 404-05 (1997).

The standard of review of a trial court's application of the hearsay rules to out-of-court statements can be more nuanced. Whether a particular out-of-court statement qualifies for admission under a hearsay exception is ultimately a question of law that is reviewed without deference to the trial court. *Wise v. State*, 471 Md. 431, 442 (2020). However, the outcome may hinge on certain fact findings by the trial court – *e.g.*, whether a statement is reliable[12] – for which the appellate court applies a more deferential standard of review. *Id*.; *see also Gordon v. State*, 431 Md. 527, 538 (2013); *Hailes v. State*, 442 Md. 488, 499 (2015).

A similar dichotomy applies to review of a trial judge's exercise of authority over the scope of cross-examination for abuse of discretion. This Court has explained:

> In controlling the course of examination of a witness, a trial court may make a variety of judgment calls under Maryland Rule 5-611 as to whether particular questions are repetitive, probative, harassing, confusing, or the like. The trial court may also restrict cross-examination based on its understanding of the legal rules that may limit particular questions or areas of inquiry. Given that the trial court has its finger on the pulse of the trial while an appellate court does not, decisions of the first type should be reviewed for abuse of discretion. Decisions based on a legal determination should be reviewed under a less deferential standard. Finally, when an appellant alleges a violation of the Confrontation Clause, an appellate court must consider whether the cumulative result of those decisions, some of which are judgment calls and some of which are legal decisions, denied the appellant the opportunity to reach the "threshold level of inquiry" required by the Confrontation Clause.

---

[12] *See, e.g., State v. Matusky*, 343 Md. 467, 486 (1996) ("The trial court's assessment of the declaration's reliability is a fact-intensive determination which we shall not ordinarily reverse unless it is clearly erroneous.").

15

*Peterson v. State*, 444 Md. 105, 124 (2015).

**B.     The Testimony, the Objection, and the Appeal**

At the time of the murders, Luz DaSilva, a 27-year old working single mother, lived with Mr. Garcia-Gaona and their five-month-old daughter in a townhome in Gaithersburg. On the day after the murders, Mr. Garcia-Gaona confessed his involvement in the crime to her.  Although initially fearful to report what he had said, she called the police about 10 days later after seeing the grieving father of one of the victims in a television news report.

1.     Ms. DaSilva's Trial Testimony and Mr. Galicia's Objections

Ms. DaSilva was called as a witness by the State on the Friday of the first week of testimony at the trial.  She testified about various topics, a number of which implicated one or more of the defendants in the murders.  In addition to describing certain observations of, and statements made to her by, Mr. Garcia-Gaona, she identified the co-defendants in photos and videos, testified as to the close personal relationship that Mr. Garcia-Gaona had with both Mr. Canales-Yanez ("like brothers") and Mr. Galicia ("pretty close"), testified that, after the night of the murders, Mr. Canales-Yanez had received permission from Mr. Garcia-Gaona to leave a case of bullets at their townhome behind a television because they were "hot," and authenticated Mr. Galicia's voice on a call she had with him.

The issue before us in this appeal arises from a brief but important slice of Ms. DaSilva's testimony.  That testimony concerned what Mr. Garcia-Gaona told her about his own participation in the murders while they watched the television news report the day after the crime.  The State offered that testimony under the hearsay exception for a statement by a party-opponent, and the trial court admitted it only against Mr. Garcia-

16

Gaona. However, it became the subject of an objection by Mr. Galicia's lawyers that extended over several bench conferences,[13] including well after Ms. DaSilva had completed her testimony.

*Direct Examination of Ms. DaSilva – Part 1*

Ms. DaSilva, who had known Mr. Garcia-Gaona since they were both teenagers, testified that she had reconnected with him during 2016. She moved in with him in his family's trailer in a trailer park in Germantown. The two of them later moved out and into a townhome in Gaithersburg, where they lived at the time of the murders.

Ms. DaSilva testified that, around midnight on the evening of the murders, she was at their residence waiting for Mr. Garcia-Gaona to come home. In an exchange of text messages, he told her that Mr. Canales-Yanez was driving him home; shortly thereafter, she saw him arrive in a car typically driven by Mr. Canales-Yanez. She was about to testify regarding a conversation the next day about the murders that she had with Mr. Garcia-Gaona when Mr. Galicia's counsel objected and a bench conference ensued.

*Bench Conference #1*

Mr. Galicia's counsel asked the court to give a limiting instruction to the jury that the testimony should be considered only against Mr. Garcia-Gaona. The State agreed that the court should give such an instruction. The judge was ready to give the jury a limiting

---

[13] Mr. Galicia was represented by two attorneys. Both made arguments in support of this objection at the bench conferences in the trial court, although the laboring oar was his lead counsel.

instruction[14] but, at the request of Mr. Garcia-Gaona's counsel, agreed to wait until Ms. DaSilva gave the anticipated testimony. The prosecutor advised the court that she had instructed Ms. DaSilva not to mention anything that Mr. Garcia-Gaona told her about the participation of his co-defendants in the murder.

At that point, Mr. Galicia's counsel announced her intention to cross-examine Ms. DaSilva about what Mr. Garcia-Gaona "did say and what he didn't say." She suggested that Ms. DaSilva would say that Mr. Garcia-Gaona, while implicating both Mr. Garcia and Mr. Canales-Yanez, had *not* told her that Mr. Galicia was involved in the murders during their conversation. Counsel characterized the predicted cross-examination as "exculpatory information."

Counsel and the court all appeared to agree that the State could elicit testimony from Ms. DaSilva concerning Mr. Garcia-Gaona's out-of-court statements to her under the hearsay exception for statements by a party-opponent, but that the exception did not apply to the proposed cross-examination by Mr. Galicia's counsel. Mr. Galicia's counsel instead argued that the out-of-court statement that she hoped to elicit – or perhaps more precisely, the out-of-court statements allegedly inculpating other co-defendants and the *lack* of an out-of-court statement concerning her client – would be admissible as a matter of "completeness of [Mr. Garcia-Gaona's] statements," as well as under the hearsay exception

---

[14] In preliminary instructions to the jury prior to opening statements, the court had forewarned the jury that some evidence might be admitted to one or more, but not all, defendants and that it would provide a limiting instruction in that circumstance.

for a statement against penal interest or a residual hearsay exception.[15]  The trial court appeared to be skeptical of that argument.  It stated that Ms. DaSilva should not discuss the participation of the co-defendants during the State's direct examination and that the request of Mr. Galicia's counsel would be re-considered before cross-examination began.[16]

*Direct Examination of Ms. DaSilva – Part 2*

When the State's direct examination of Ms. DaSilva resumed, she testified that, during her conversation with Mr. Garcia-Gaona the day after the murders, she had asked him what had happened.  In response, according to Ms. DaSilva, he had confessed to his participation in the murders, which were receiving prominent coverage on the television news.  She testified:

> Q:    And what did he say about what he himself did?
>
> A:    What he himself did?  That he basically was, was in the situation with the shooting.  He basically - -
>
> Q:    How did he describe it?
>
> A:    That it was like a seven-second movie.
>
> Q:    Did he, those words, did he actually say, it was like a seven-second movie?
>
> A:    Yes.
>
> Q:    And what else did he say about what happened?

---

[15] *See* Maryland Rule 5-803(24).  Mr. Galicia has not relied on the residual hearsay exception on appeal.

[16] Mr. Galicia's counsel also used the occasion to renew a motion to sever his trial from that of his co-defendants, but the trial judge pointed out that trying Mr. Galicia separately would not provide better grounds for admitting an out-of-court statement – or the absence of a statement – by Mr. Garcia-Gaona.

A: That that day he took the cellphone from the boys, smashed it, and then after they just started shooting them.

Q: And did, how was he - - how did he appear to you at the time he was telling you these things?

A: Nothing surprising, just, you know, like a bit nervous, jittery.

Q: What was going on on the television?

A: The news.

Q: And what was on the news?

A: The case about the two boys that got murdered on June 5th.

Q: Is that how it came up?

A: Yes.

Ms. DaSilva went on to testify that Mr. Garcia-Gaona told her that the murders were set up through Snapchat, that she was surprised, and that she had not called the police as a result of that conversation because she was "scared." She then testified on other matters related to the case, which were not based on the statements that Mr. Garcia-Gaona had made to her the day after the murders. During that testimony, Mr. Galicia's counsel made an objection, which resulted in a bench conference.

*Bench Conference #2*

After the court and counsel finished discussing a separate issue that had initially resulted in the bench conference, Mr. Galicia's counsel returned to the topic of her desired cross-examination of Ms. DaSilva. She seized on Ms. DaSilva's use of the word "they" when recounting Mr. Garcia-Gaona's description of the shooting. Mr. Galicia's counsel

20

asserted that Mr. Galicia was prejudiced by Ms. DaSilva's use of that pronoun.[17]  Mr. Galicia's counsel reiterated her desire to cross-examine Ms. DaSilva about that statement in the hope that Ms. DaSilva would say that Mr. Garcia-Gaona had not mentioned Mr. Galicia as one of the shooters.  The trial court deferred ruling on that request until it was counsel's turn to cross-examine the witness.

*Direct Examination of Ms. DaSilva – Part 3*

The direct examination of Ms. DaSilva on matters other than Mr. Garcia-Gaona's statements to her continued, and the prosecution soon indicated that it was ready to conclude the direct examination.  After a recess for lunch, the trial court again took up the cross-examination issue out of the jury's presence.

*Bench Conference #3*[18]

The trial court reprised Ms. DaSilva's testimony concerning Mr. Garcia-Gaona's statement to her about the circumstances of the shooting and her use of the word "they" in recounting what he had said about the shooting.  The court noted that the jury had already heard other evidence that there were multiple shooters and that Ms. DaSilva's use of the

---

[17] Mr. Galicia's counsel, who herself had told the jury in opening statement that there were multiple shooters involved in the murders, did not explain how the generic pronoun "they" specifically implicated her client.

[18] This discussion among the court and counsel – and the later ones on this topic – took place while the jury was out of the courtroom and therefore likely did not occur at the bench.  We use the label "bench conference" as a shorthand to indicate that each took place outside the presence of the jury.

21

word "they" had not specifically implicated any co-defendant.[19] The court reiterated its intention to give a limiting instruction that would direct the jury to consider that testimony only as to Mr. Garcia-Gaona – the maker of the out-of-court statement.

Mr. Galicia's counsel argued that her client had been prejudiced by the testimony. She proposed that the court sever either her client or Mr. Garcia from the trial. In counsel's view, that would eliminate any prejudice if counsel were to ask Ms. DaSilva to whom she believed Mr. Garcia-Gaona was referring when she testified that he had said "*they* just started shooting."

Mr. Galicia's counsel then presented the court with a "transcript" of an audio recording of a 90-minute conversation between Ms. DaSilva and a police detective in a police car shortly after midnight on June 17, 2017. That conversation took place shortly after Ms. DaSilva had called the police to tell them of Mr. Garcia-Gaona's involvement in the murders.[20] Mr. Galicia's counsel stated that she wished to "introduce the complete statement from that witness" – presumably referring to statements that Ms. DaSilva

---

[19] The court noted that, if Mr. Galicia's counsel were allowed to ask Ms. DaSilva whether Mr. Garcia-Gaona had implicated Mr. Galicia, the jury would expect Mr. Garcia's attorney to do the same and, assuming that Ms. DaSilva would testify as Mr. Galicia's counsel had represented, Ms. DaSilva would say that Mr. Garcia-Gaona had directly inculpated his younger brother, a co-defendant in the case. Thus, the court foresaw a *Bruton*-type issue arising if it permitted Mr. Galicia's attorney to elicit hearsay statements of Mr. Garcia-Gaona aside from his confession of his own involvement.

[20] The document was marked as a defense exhibit and made part of the record. The audio recording itself was not introduced or otherwise made part of the record. No one testified that the document was a fair and accurate verbatim rendering of the content of the audio recording or identified its source. However, the parties have apparently accepted it as accurate and have referred to it as a "transcript." And so will we.

22

attributed to Mr. Garcia-Gaona in her conversation with the detective (as opposed to the entire 91-page transcript of Ms. DaSilva's conversation with the detective, which wandered over many topics). Mr. Galicia's counsel also said that she wanted to introduce "all of the statements"[21] that Mr. Garcia-Gaona made to Ms. DaSilva about who was involved in the murders under the "rule of completeness."[22] She argued that such action was necessary to "cure the prejudice" and referred to the "curative admission doctrine."[23]

Mr. Galicia's counsel moved the admission of the transcript for the purpose of preserving the issue for appeal. The trial court allowed the transcript to be marked, but not

---

[21] Counsel did not identify at that time the precise universe of statements to which she was referring. As we shall see, at a later bench conference concerning this objection, she specified 10 items on which she wished to cross-examine Ms. DaSilva concerning the co-defendants; however, only a couple of those items pertained to statements of Mr. Garcia-Gaona.

[22] The common law doctrine of "verbal completeness" provides that, when one party introduces a portion of a statement into evidence, the opposing party may introduce "the remainder of what was said on the same subject at the same time." *Otto v. State*, 459 Md. 423, 449 (2018) (citations and internal quotation marks omitted). However, "evidence that is otherwise inadmissible as hearsay [does not] become admissible solely because it is derived from a single writing or conversation." *Id*. at 451 (citation and internal quotation marks omitted). *Cf*. Maryland Rule 5-106 (rule of completeness with respect to writings and recorded statements). Mr. Galicia has not relied on the doctrine of verbal completeness in his brief or argument in this Court.

[23] The curative admission doctrine "in rare instances allows otherwise irrelevant and incompetent evidence to repair the damage caused by previously admitted highly prejudicial incompetent inadmissible evidence." *Conyers v. State*, 345 Md. 525, 546 (1997) (citation and internal quotation marks omitted). Mr. Galicia's brief in this Court alludes to the curative admission doctrine in a footnote as an alternative basis for affirming the decision of the Court of Special Appeals – although the intermediate appellate court itself concluded that the curative admission doctrine did not apply to this case because Mr. Garcia-Gaona's out-of-court statement to Ms. DaSilva was properly admitted during direct examination under an exception to the hearsay rule. 2021 WL 130513 at *19 n.12.

admitted. The court once again reiterated that it would give a limiting instruction, which it did after the jury returned to the courtroom.[24]

*Limiting Instruction*

The court gave the following instruction:

> [T]his is another occasion that I mentioned to you at the beginning of the trial where there are certain times during the trial where certain evidence is being offered as against certain defendants and not against all defendants. So that, that admonition applies to the testimony that you heard from Luz [DaSilva] regarding any conversation she may or may not have had with Edgar [Garcia-Gaona] following June 5th of 2017. Any of that testimony is offered only against Edgar [Garcia-Gaona] and against no other defendant and should not be considered by you in any way against any other defendant.

> Each of these defendant[s are] entitled to have the case decided separately on the evidence that applies to that defendant only. So the testimony was offered against Edgar [Garcia-Gaona] and not against the others.

At the end of the trial, the court reminded the jury of the limiting instruction and reiterated that it was to consider the evidence only as to the defendant against whom it was admitted. After the court gave the limiting instruction, the prosecution completed its direct examination with a few questions that do not pertain here. Mr. Galicia's counsel then proceeded to cross-examine Ms. DaSilva.

---

[24] Mr. Garcia-Gaona's counsel took a somewhat contrary position that Ms. DaSilva should be permitted to use the word "they" in testifying about his client's out-of-court statement – presumably to facilitate the argument that he later made in closing argument that his client was referring to third parties other than himself as the shooters. Counsel did not cite any legal authority for that position and the jury did not accept the argument, as it convicted Mr. Garcia-Gaona on all counts.

*Cross-Examination of Ms. DaSilva*

During cross-examination by Mr. Galicia's counsel, Ms. DaSilva confirmed that Mr. Garcia-Gaona had confessed his own involvement, and she again recounted her motivation for calling the police. Mr. Galicia's counsel elicited from her the names of other friends and family of Mr. Garcia-Gaona, one of whom Ms. DaSilva agreed was a "closer" friend of Mr. Garcia-Gaona than Mr. Galicia was. Counsel did not directly question her about her use of the pronoun "they" in her testimony regarding Mr. Garcia-Gaona's confession to her that "they" had "just started shooting."

Counsel for Mr. Garcia-Gaona also cross-examined Ms. DaSilva about various sources of acrimony between her and Mr. Garcia-Gaona prior to her decision to call the police. Counsel did not question her about Mr. Garcia-Gaona's confession to her.[25]

*Redirect Examination of Ms. DaSilva*

In its redirect examination of Ms. DaSilva, the State briefly re-visited her previously stated reason for calling the police, suggested that Mr. Garcia-Gaona was responsible for the other issues in their relationship, and noted that Mr. Garcia-Gaona was no longer close to some of the friends mentioned in cross-examination.

At that point Ms. DaSilva was excused from the stand and the State called several other witnesses before the court recessed for the weekend.

---

[25] Counsel for Mr. Garcia cross-examined Ms. DaSilva only briefly to establish that his client had not been part of a trip that Mr. Garcia-Gaona, Mr. Caneles-Yanez, and Mr. Galicia took to Ocean City shortly before the murders.

*Bench Conference #4*

The trial resumed the following Monday. At the outset, before the jury returned to the courtroom, the court declared a mistrial in the case against Mr. Garcia because his attorney had a medical emergency and was unable to continue. Mr. Galicia's counsel again moved for his trial to be severed from Mr. Garcia-Gaona's trial. Counsel also renewed the request to cross-examine Ms. DaSilva about whom she believed Mr. Garcia-Gaona was referring to when she said he had told her that "*they* just started shooting." Counsel again cited the "curative admission doctrine" and referred the court to two appellate decisions. The court once again denied the motion to sever the trials but reserved judgment on the cross-examination request.

Eight more prosecution witnesses testified that day, after which the court dismissed the jury until Wednesday.[26] After the jury was dismissed, the court and counsel discussed some pending evidentiary issues, including the further examination of Ms. DaSilva proposed by Mr. Galicia's counsel.

*Bench Conference #5*

During the colloquy between the court and counsel, Mr. Galicia's attorney directed the court to specific excerpts in the transcript of the conversation between Ms. DaSilva and the police detective in which there were references to Mr. Canales-Yanez, his wife, and Mr. Garcia. The State pointed out that some of the references concerned not statements of

---

[26] The court did not sit on Tuesday, which was an election day.

26

Mr. Garcia-Gaona to Ms. DaSilva, but things Ms. DaSilva had learned from others.[27]   The trial judge noted that nothing in those excerpts appeared to be "exonerating evidence" with respect to Mr. Galicia, but said he would review the transcript and return to the issue when the trial resumed on Wednesday.

*Bench Conference #6*

The following Wednesday, the jury heard testimony from three more prosecution witnesses.   After the jury was dismissed for the day, the discussion concerning the possibility of recalling Ms. DaSilva to the stand and the transcript of her conversation with the detective resumed.   The trial judge indicated that he had reviewed the transcript with the understanding that the defense was seeking to admit specific excerpts from it.   Mr. Galicia's counsel clarified that she was not seeking to admit the document itself and explained that she was "seeking to introduce the live testimony, the complete testimony from Luz DaSilva that includes what [Mr. Garcia-Gaona] told her regarding with whom he committed the crime, which is a self-statement against penal interest."

A lengthy colloquy followed concerning the source of the misunderstanding.   Mr. Galicia's counsel stated that the transcript amounted to a "proffer" of Mr. Garcia-Gaona's "complete statement" to Ms. DaSilva.   The court responded that the document was "nowhere near a transcript of what [Mr. Garcia-Gaona] said," but rather a "rambling" account of information that Ms. DaSilva may have learned from various sources, including

---

[27] Mr. Galicia's counsel pointed to 10 specific excerpts of the document by page and line.  Only a couple of those excerpts clearly concerned statements by Mr. Garcia-Gaona to Ms. DaSilva.  Some of the excerpts concerned statements by Mr. Canales-Yanez's wife or observations made by Ms. DaSilva herself.

Mr. Garcia-Gaona.[28] Defense counsel pointed to a specific excerpt as an occasion on which Ms. DaSilva had stated whom Mr. Garcia-Gaona had identified as the shooters, but the court noted that it appeared in context to involve Ms. DaSilva identifying people depicted in a photograph. During the bench conference, the Assistant State's Attorney proffered that, based on her pretrial interviews of Ms. DaSilva, Ms. DaSilva would say that it was difficult to obtain information from Mr. Garcia-Gaona and that Ms. DaSilva herself did not know who "they" were.

The trial court then recounted his own review of the transcript by page and line and noted that Ms. DaSilva attributed statements to Mr. Garcia-Gaona in very few instances, that Mr. Garcia-Gaona only clearly identified his younger brother as a participant in the shooting, and that nothing in the transcript indicated whether Mr. Garcia-Gaona had said that Mr. Galicia or Mr. Canales-Yanez were – or were not – involved.

The trial court pointed to one portion of the transcript in which Ms. DaSilva said that she had been surprised when Mr. Garcia-Gaona had said that his younger brother, Mr. Garcia, had been one of the shooters. In that excerpt, Ms. DaSilva was reported as telling

---

[28] The Court of Special Appeals noted the trial court's description of the conversation between Ms. DaSilva and the detective as "rambling" and characterized it as an improper adverse comment on the credibility of Ms. DaSilva. 2021 WL 130513 at *30. In the context of the conversation depicted in that document, that adjective is not so much an evaluation of Ms. DaSilva's credibility as a description of the nature of the conversation. If the 91-page document is an accurate account, the conversation did indeed wander from topic to topic, occasionally interrupted by another detective who was attending to Ms. DaSilva's infant daughter. And the rambling nature of the conversation does not seem unusual for two people sitting in a car in the middle of the night or for a detective attempting to establish rapport in an initial interview with a young woman who had just contacted police with important information about a double murder and who expressed concern about her own safety.

28

the detective that "[Mr. Garcia-Gaona] was surprised that his little brother took out a gun and just shot them guys, too" and "that his brother, [Roger Garcia], took out the gun too and shot the guys as well."[29]

The court offered to recall Ms. DaSilva and ask her, outside the presence of the jury, if Mr. Garcia-Gaona ever told her that Mr. Galicia was not involved in the murders. If she said yes, the court would allow her to testify to that effect before the jury. If she said no, "that's it." Mr. Galicia's counsel objected to the form of the proposed question, and never took the court up on the offer to recall Ms. DaSilva to clarify the matter.

*Bench Conference #7*

The trial court addressed the issue for the final time the next morning before the jury returned to the courtroom – by then, nearly a week after Ms. DaSilva had completed her testimony. The court summarized Ms. DaSilva's testimony, the prior bench conferences, and the limiting instruction it had given. The trial judge stated that he had reviewed the cases cited by Mr. Galicia's counsel and that those cases did not support allowing counsel for Mr. Galicia to recall Ms. DaSilva to ask her "questions about what [Mr. Garcia-Gaona] didn't say about [Mr. Galicia]."

*Closing Argument*

One week later, after the presentation of additional evidence by the State, the evidence introduced by Mr. Galicia, and a brief rebuttal case by the State, the parties made

---

[29] That excerpt, which had not been specified by Mr. Galicia's attorney as part of her proffer, was located in the transcript at some remove from the part of the transcript where Ms. DaSilva related Mr. Garcia-Gaona's confession of his own involvement.

closing arguments. In its closing and rebuttal arguments summarizing the evidence in the case, and more specifically in describing Mr. Garcia-Gaona's statements to Ms. DaSilva and the evidence against Mr. Galicia, the State did not mention Ms. DaSilva's use of the word "they" in her testimony about Mr. Garcia-Gaona's confession to her.

In her own closing argument, Mr. Galicia's attorney reiterated her opening statement that there were three shooters involved in the murder (and that Mr. Galicia was not one of them), characterized Ms. DaSilva as a "hero" who "exonerate[d]" Mr. Galicia, and argued that another witness who linked Mr. Galicia to the planning of the murders was not credible.

### 2. The Appeal

In reversing the convictions of Mr. Galicia, the Court of Special Appeals focused on two aspects of Ms. DaSilva's testimony about Mr. Garcia-Gaona's out-of-court confession to her: (1) Ms. DaSilva's use of the plural pronoun "they" when testifying that he had told her that "*they* just started shooting" and (2) the trial court's ruling that Mr. Galicia's counsel could not elicit, on cross-examination of Ms. DaSilva, a separate out-of-court statement of Mr. Garcia-Gaona that identified his younger brother as one of the shooters. 2021 WL 130513 at *29-32.

In the intermediate appellate court's view, Mr. Galicia's rights under the Confrontation Clauses were violated by the trial court's decision not to allow Mr. Galicia's counsel to elicit other out-of-court statements by Mr. Garcia-Gaona from Ms. DaSilva after she used the plural "they" in describing Mr. Garcia-Gaona's admission to her during her direct examination. The court reasoned that, because the State presented other evidence

30

placing Mr. Galicia with the other three alleged shooters on the night of the murders, the undefined use of "they" implied that Mr. Galicia was included. The court concluded that, although the jury had been instructed that the statement was to be considered only against Mr. Garcia-Gaona, Ms. DaSilva's use of "they" triggered Mr. Galicia's right to recall Ms. DaSilva "to probe the meaning of 'they'" and whether Ms. DaSilva understood Mr. Garcia-Gaona's statement to include Mr. Galicia among the shooters.

The intermediate appellate court also held that the alleged out-of-court statement by Mr. Garcia-Gaona to Ms. DaSilva that Mr. Garcia had "shot them guys, too," which was described in the transcript of her police car conversation with the detective, was admissible under the exception for a statement against the penal interest of the declarant. The court determined that this statement was adverse to Mr. Garcia-Gaona's own penal interest, that Mr. Garcia-Gaona was unavailable as a witness, and that the necessary corroborating circumstances required for admission under Maryland Rule 5-804(b)(3) existed. The intermediate appellate court further reasoned that exclusion of that statement, coupled with the admission of Mr. Garcia-Gaona's confession that "they just started shooting" was not harmless beyond a reasonable doubt. The court stated that "when the defendant is the proponent of a statement against penal interest and it is central to his or her defense, the [trial] court should not impose 'insurmountable evidentiary hurdles' to its admission." 2021 WL 130513 at *31.

## C.    *Analysis*

Mr. Galicia's counsel cross-examined Ms. DaSilva at some length. The issue is whether the trial court abused its discretion when it limited the scope of that cross-

31

examination in one respect, based on the court's assessment of the admissibility of the hearsay evidence that Mr. Galicia's counsel hoped to elicit from Ms. DaSilva.

1.      "They"

As outlined earlier, during the testimony of Ms. DaSilva, the State introduced Mr. Garcia-Gaona's confession to her on June 6, 2017, that he had been involved in the murders of the two high school students the day before. As the State indicated at that time, that out-of-court statement was admissible against Mr. Garcia-Gaona under the exception for a statement by a party-opponent. Initially, Mr. Galicia took the position that the statement was admissible only against Mr. Garcia-Gaona and that the court should give the jury a limiting instruction to that effect. The State immediately agreed that a limiting instruction would be appropriate, and the court ultimately gave that instruction, telling the jury to consider that evidence only as to Mr. Garcia-Gaona. No one has alleged any error in the admission of that evidence under the exception for a statement by a party-opponent or in the limiting instruction that was given.

When Ms. DaSilva used the generic plural pronoun "they" in recounting Mr. Garcia-Gaona's description of the shooting, Mr. Galicia's counsel asserted that her client had been prejudiced by the use of that pronoun and asked for a severance, or leeway to introduce other hearsay statements of Mr. Garcia-Gaona, or both. Mr. Galicia's counsel asserted that Ms. DaSilva's testimony had placed "that idea in [the jury's] head that 'they' included Rony Galicia" and thereby prejudiced her client. The use of the pronoun "they" became the linchpin for subsequent discussions in which Mr. Galicia's attorneys sought to introduce hearsay to "cure" the alleged prejudice. The relief sought and the rationale for it

32

morphed over the course of multiple bench conferences, during which the claim of prejudice was never explained with any greater precision.

Indeed, the basis for the claim of prejudice was unclear at best. Ms. DaSilva's use of the pronoun "they" to describe the shooters was perfectly consistent with Mr. Galicia's own theory of the case, which his attorney had described in some detail in her opening statement – that there were multiple shooters, including Mr. Garcia-Gaona, but not including Mr. Galicia. Nothing in the out-of-court statement elicited by the State against Mr. Garcia-Gaona contradicted that theory,[30] and nothing in the bench conferences that followed ever clarified what prejudice might have occurred or why there was something to "cure."[31] The trial judge was understandably perplexed.

With respect to this issue, the Court of Special Appeals concluded that Ms. DaSilva's use of the word "they" triggered a right for Mr. Galicia's counsel "to elucidate what [Mr. Garcia-Gaona] meant by the word 'they.'" 2011 WL 130513 at *32. In the intermediate appellate court's view, the limitation on Mr. Galicia's cross-examination of Ms. DaSilva violated Mr. Galicia's rights under the Confrontation Clauses.

---

[30] Of course, there was substantial other evidence in the case from other witnesses, as well as Ms. DaSilva, that pointed to Mr. Galicia as one of the conspirators. But none of that was part of the out-of-court statement elicited by the State and Mr. Galicia's counsel had the opportunity to cross-examine the witnesses who presented that evidence.

[31] Given that Mr. Garcia-Gaona's statement was admissible against him under the exception for statements by a party-opponent and given the absence of prejudice to Mr. Galicia in Ms. DaSilva's use of the pronoun "they," there is no occasion to consider the curative admission doctrine, which is triggered only when inadmissible, prejudicial evidence is improperly admitted. *See* footnote 23 above.

33

In our view, there was no violation of the Confrontation Clauses. As indicated earlier, in *Bruton*, the Supreme Court held that a defendant's right to confront the witnesses against him was violated by the prosecution's introduction of a non-testifying co-defendant's confession that expressly named the defendant as a participant in the crime, even though the trial court had given an instruction that told the jury to consider the confession only against the declarant-defendant. *Bruton*, 391 U.S. at 127-28. The Court suggested that redaction of the co-defendant's name from the confession might have avoided a violation of the Confrontation Clause – a suggestion that it later confirmed in *Richardson v. Marsh*, 481 U.S. 200 (1987) (holding that redaction of confession to eliminate co-defendant's name, together with limiting instruction that confession was to be considered only against the declarant-defendant, successfully avoided *Bruton* issue).

Of course, a redaction of a non-testifying defendant's confession to eliminate a reference to a co-defendant must be sufficiently generic to avoid an implicit identification of that co-defendant. A redaction did not suffice in *Gray v. Maryland*, 523 U.S. 185, 192 (1998), where a non-testifying defendant's confession that he and certain other named people had beaten the victim was replaced with the phrase "me, deleted, deleted, and a few other guys." The Court held that such a redaction called attention to the fact that names had been removed that "obviously refer[red] to someone" and violated the *Bruton* rule. 523 U.S. at 195-96. On the other hand, a redaction that simply identified the assailants as "me and a few other guys" would suffice. *Id*. The Court acknowledged that such a redaction, coupled with additional evidence outside of the confession, might still lead the

jury to infer that the co-defendant was involved in the crime, but that did not create a *Bruton* problem.

If the mere reference to other, unspecified co-conspirators in the form of "and a few other guys" does not run afoul of the Confrontation Clauses, neither does a generic plural "they" in the phrase "they just started shooting them."[32]  Both the State and Mr. Galicia's defense agreed that there were multiple shooters.  Certainly, the State hoped to persuade the jury, through evidence other than Mr. Garcia-Gaona's statement, that Mr. Galicia was one of the several shooters, just as Mr. Galicia's defense hoped to persuade the jury that he was not – or at least raise a reasonable doubt that he was.  Ms. DaSilva's testimony concerning Mr. Garcia-Gaona's confession to her was neutral on who, in addition to Mr. Garcia-Gaona, those shooters were.  Thus, there was no violation of Mr. Galicia's rights under the Confrontation Clauses.

In his brief before us, Mr. Galicia does not argue that his rights under the Confrontation Clauses were violated.  Instead, he makes a more amorphous argument that his due process right to call witnesses on his behalf was violated.  This argument appears to have two parts.  First, Mr. Galicia continues to argue that Ms. DaSilva's use of the

---

[32] In its Confrontation Clause analysis, the Court of Special Appeals relied almost exclusively on a comparison to its prior decision in *Adam v. State*, 14 Md. App. 135, 142-43 (1972), a decision that preceded the Supreme Court decisions in *Richardson* and *Gray*. 2021 WL 130513 at *32.  In *Adam*, one of the two defendants had used the plural pronoun "we" in an out-of-court statement confessing his own participation in the crime.  The Court of Special Appeals did not analyze the *Bruton* issue in detail, but characterized the confessing defendant's use of the pronoun "we" as "innocuous" in context – perhaps presaging the Supreme Court's decision in *Richardson* – and observed that any potential *Bruton* issue was eliminated when that defendant took the stand and was thus available for cross-examination by the co-defendant's counsel.

pronoun "they" in her testimony was prejudicial to him, even though the jury was told (at the request of his counsel) that it was admitted only against Mr. Garcia-Gaona – which he now views as inadequate. Second, from that premise of prejudice, he argues that his counsel was entitled to cross-examine Ms. DaSilva to elicit hearsay statements – or the lack thereof – in order to lay a foundation for an argument that Mr. Garcia-Gaona had identified for Ms. DaSilva all of the participants in the shooting during their conversation the day after the murders and that Mr. Galicia was absent from that roster.

In fact, it was never clear, from either the transcript of Ms. DaSilva's police car conversation or otherwise, that she would actually testify that Mr. Garcia-Gaona had exculpated Mr. Galicia. At most, Mr. Galicia's counsel argued that, based on the defense interpretation of the transcript, Mr. Garcia-Gaona had impliedly asserted that Mr. Galicia was not involved because there were a few references to Mr. Garcia and to Mr. Canales-Yanez, but not to him, during some portions of that conversation.[33] As discussed below,

---

[33] With respect to Ms. DaSilva's police car conversation, Mr. Galicia cites the McLain treatise for the proposition that the lack of a reference to him as a shooter in the portion of that conversation where she described statements Mr. Garcia-Gaona made to her was the "absence of a statement" that did not qualify as hearsay and that was independently admissible as circumstantial evidence that he was not a shooter. *See* McLain, Maryland Evidence §801:4(b)((i), (c). However, silence or the failure of a person to make a particular statement "is usually too inconclusive to be admitted" and therefore is often excluded not only as hearsay, but also on relevance grounds. Murphy, Maryland Evidence Handbook, §703. For a similar reason, two hearsay exceptions relating to the absence of statements or information both apply in circumstances in which it would be a "regular" practice to make a statement or record such that the absence of a statement or record or statement is significant. *See* Maryland Rule 5-803(7), (10). The clear import of Mr. Galicia's effort to introduce evidence of the content of Mr. Garcia-Gaona's out-of-court conversation with Ms. DaSilva was to establish an implied assertion by Mr. Garcia-Gaona that Mr. Galicia was not one of the shooters, which would bring it within the realm of hearsay.

36

defense counsel did not accept the trial court's offer to ask Ms. DaSilva, outside the presence of the jury, for clarification, nor did defense counsel elect to recall Ms. DaSilva as part of the defense case.

2.      Alleged Out-of-Court Statement Inculpating Roger Garcia

Near the outset of Ms. DaSilva's testimony, Mr. Galicia's counsel announced her intention to cross-examine Ms. DaSilva about what Mr. Garcia-Gaona "did say and what he didn't say" about the participation of his co-defendants in the murders. During the ensuing bench conferences, it became evident that, using the transcript of Ms. DaSilva's police car conversation with the detective on July 17, 2017, counsel sought to elicit from her out-of-court statements by Mr. Garcia-Gaona that clearly implicated his younger brother in the murders and, less clearly, Mr. Canales-Yanez. She also hoped to elicit from Ms. DaSilva the absence of such a statement by Mr. Garcia-Gaona implicating Mr. Galicia.

In its opinion, the Court of Special Appeals focused primarily on whether the hearsay exception for a statement against penal interest applied to Mr. Garcia-Gaona's alleged out-of-court statement to Ms. DaSilva that Roger Garcia "took out a gun and just shot them guys, too" – the most specific excerpt from the 91-page transcript in which Ms. DaSilva indicated that Mr. Garcia-Gaona had identified another participant in the shooting.

Focusing on Ms. DaSilva's use of the word "too" in her conversation with the detective, the intermediate appellate court held that this statement about Roger Garcia's involvement in the shooting was admissible as a statement against Edgar Garcia-Gaona's

37

own penal interest.[34]  It further held that Mr. Galicia was entitled to adduce that testimony.

That holding was the primary basis on which the court reversed Mr. Galicia's convictions.

In their arguments before this Court, the parties have debated at some length

whether that particular out-of-court statement *inculpating Roger Garcia* was genuinely

adverse to *Mr. Garcia-Gaona's* penal interest.[35]  To reach a conclusion that it was against

---

[34] It appears from the opinion of the intermediate appellate court that it may have been under a misimpression as to the basis for the admission of Mr. Garcia-Gaona's out-of-court confession of his own involvement and as to whether it was also admitted against Mr. Galicia.  In two instances, the opinion states that the State had introduced Mr. Garcia-Gaona's confession against Mr. Garcia-Gaona himself under the exception for a statement by a party-opponent and *also against Mr. Galicia under the exception for a statement against penal interest*.  2021 WL 130513 at *18, *21.  A later part of the opinion indicates that the State introduced this statement against Mr. Garcia-Gaona *as a statement against penal interest*.  *Id*. at *29.

In fact, as indicated in Part II.B. of this opinion, the State had relied on the hearsay exception for a statement by a party-opponent and had introduced Mr. Garcia-Gaona's confession only against Mr. Garcia-Gaona himself.  Although the exception for a statement against penal interest would also have supported admission of that testimony against Mr. Garcia-Gaona, there was no need for the State to rely on that narrower hearsay exception. There is no indication in the record that the State ever purported to introduce Mr. Garcia-Gaona's confession against *any* of his co-defendants *on any ground*.

The hearsay exception for statements against penal interest was first invoked by Mr. Galicia's counsel with respect to her desired cross-examination of Ms. DaSilva, and the out-of-court statements in question were those in which Mr. Garcia-Gaona allegedly inculpated his brother and Mr. Canales-Yanez in his conversation with Ms. DaSilva.

As indicated in Part II.A. of this opinion, the two hearsay exceptions are often confused with one another.  The confusion in this case is also understandable in light of the many references to the exception for statements against penal interest in the several bench conferences concerning Mr. Galicia's objection.  In addition, a portion of the State's brief addressing a severance issue in the Court of Special Appeals discussed whether Mr. Garcia-Gaona's confession would be admissible under that exception in a hypothetical separate trial involving only Mr. Galicia.  But it is clear from the record of this case that the State did not purport to do so in this trial.

[35] There does not appear to be much dispute about the other two elements of the exception – the unavailability of the declarant and the trustworthiness of the statement.

the penal interest of Mr. Garcia-Gaona requires a lot of work by the word "too" when it is unclear whether, in using that word, Ms. DaSilva was quoting the declarant or adding her own emphasis to the statement.

The Court of Special Appeals suggested that a defendant in a criminal case faces a lower threshold to admit a statement against a declarant's penal interest if the out-of-court statement is offered to exculpate the defendant. 2021 WL 130513 at *25, *31. That is not the case. As originally adopted, Maryland Rule 5-804(b)(3), like its federal counterpart, explicitly imposed a *heightened* corroboration requirement when a statement against interest was offered to exculpate the accused. The last sentence of the rule, in its original form, stated: "A statement tending to expose the declarant to criminal liability and *offered to exculpate the accused* is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." In 2010, both the federal and Maryland rules were amended to adopt a "unitary approach" that applies the same standard whether the proponent of the statement is the defense or the prosecution. *See* 2010 Amendments, Advisory Committee Notes to Fed. R. Evid. 804; 165th Report of the Standing Committee on Rules of Practice and Procedure (August 24, 2010) at p.4.

The Court of Special Appeals relied in particular on this Court's decision in *Gray v. State*, 368 Md. 529 (2002). In that case the defendant was on trial for a crime as to which another individual had admitted committing in out-of-court statements; that individual

---

The State concedes that Mr. Garcia-Gaona, as a co-defendant at the trial, was unavailable. There also appears to be no dispute that the statement – insofar as it inculpated Roger Garcia – was trustworthy as the State agrees that Mr. Garcia was a participant in the murders.

invoked his Fifth Amendment right not to testify at the trial. This Court held that the defendant was entitled to introduce evidence of those admissions as a statement against the penal interest of the individual who made them. Referring to the trial court's exclusion of the admissions and a separate ruling concerning the same witness, the Court concluded that "the trial court's evidentiary rulings effectively blocked [the defendant's] ability to present a defense that, under the facts of this case, he was entitled to present." 368 Md. at 547. As a result, it reversed the defendant's conviction.

The Court of Special Appeals cited *Gray* – as well as a decision of its own[36] – for the proposition that "when a criminal defendant is the proponent of a statement against penal interest that exculpates him and inculpates another, the defendant's right to present a defense is implicated and, if corroboration is present, the balance shifts in favor of admission." 2021 WL 130513 at *25. The importance of a hearsay statement to a party's case does not bear on its admissibility under Maryland Rule 5-804(b)(3). In *Gray*, the Court first applied the three-pronged test to determine that the statement was admissible as a statement against penal interest. The Court's explanation that the defendant had been denied his ability to present a defense went to its ultimate conclusion that the error was prejudicial and not harmless. 368 Md. at 547. Nowhere did the *Gray* Court suggest that a defendant's abstract "right to present a defense" altered its threshold admissibility

---

[36] *Roebuck v. State*, 148 Md. App. 563 (2002). *Roebuck* involved an out-of-court statement of a co-defendant who had been convicted in a separate trial and who had both inculpated himself and exculpated the defendant in the out-of-court statement. As in *Gray*, the focus of the court's analysis was on the reliability of the out-of-court statement, not whether it was against the declarant's penal interest.

determination. As this Court has previously explained, the right to present a defense does not include the right to admit incompetent evidence. *See Kelly v. State*, 392 Md. 511, 537 (2006) (noting that a defendant's right to compulsory process does not "confer a right to present inadmissible evidence").

In this case, the trial court never definitively ruled on whether Mr. Garcia-Gaona's statement that his brother "shot them guys, too" was independently admissible as a statement against the declarant's penal interest. That may have been because, by itself, any out-of-court statement Mr. Garcia-Gaona may have made inculpating his younger brother had no bearing on the case against Mr. Galicia. Testimony by Ms. DaSilva that Mr. Garcia-Gaona had inculpated his younger brother potentially had probative value in Mr. Galicia's defense only if two other propositions were also true: (1) Ms. DaSilva would testify that Mr. Garcia-Gaona had said Mr. Galicia was not involved or had made no similar statement inculpating Mr. Galicia and (2) it appeared that Mr. Garcia-Gaona's statements to her were a comprehensive description of the participants and events surrounding the murders.

It was never established at trial what exactly Ms. DaSilva would say as to either proposition. As to the first proposition, during one of the later bench conferences, the trial judge offered to have Ms. DaSilva returned to the courtroom and questioned outside the presence of the jury on the topic of what Mr. Garcia-Gaona may have told Ms. DaSilva about Mr. Galicia's involvement in the offense. Mr. Galicia's counsel objected to the form of a question the court proposed to ask her and never pursued the idea of clarifying, outside the presence of the jury, what her testimony would be. Instead, Mr. Galicia's defense

elected to rely solely on the transcript of Ms. DaSilva's police car conversation with the detective for its proffer.

As to the second proposition, the proffer relied upon by Mr. Galicia's defense counsel does not appear to include a comprehensive description by Mr. Garcia-Gaona for Ms. DaSilva of the circumstances of the murders. After reviewing the entire transcript of the police car conversation, as well as the excerpts spotlighted by Mr. Galicia's counsel, the trial judge was skeptical that the conversation – which ranged over many topics, most of them unrelated to her conversation with Mr. Garcia-Gaona on the day after the murders – represented an exhaustive account of her conversation with Mr. Garcia-Gaona. From our own review of the transcript, that skepticism appears well taken. At the very least, we cannot say that the trial judge abused his discretion in declining to allow Mr. Galicia's counsel to pursue a line of cross-examination that would elicit out-of-court statements (or non-statements) that were not clearly admissible under an exception to the hearsay rule and that would directly inculpate Mr. Garcia, who was still one of his co-defendants at the time Ms. DaSilva was on the stand.

3.      Summary

Under the circumstances of this case, the trial court did not abuse its discretion when it declined to allow Mr. Galicia's counsel to cross-examine Ms. DaSilva about an alleged out-of-court statement by Mr. Garcia-Gaona concerning Mr. Garcia based on Ms. DaSilva's police car conversation with the detective. Even if Mr. Garcia-Gaona's statement to her inculpating his younger brother could be properly characterized as a statement against *Mr. Garcia-Gaona's own penal interest*, that evidence would only have

42

been probative as to Mr. Galicia's involvement if adduced in conjunction with some evidence that Mr. Garcia-Gaona was purporting to provide a complete account of the murders to Ms. DaSilva that did not include Mr. Galicia. Defense counsel did not pursue the opportunity to recall Ms. DaSilva to clarify whether she could actually provide that testimony. "The fundamental rationale in leaving the matter of prejudice [or not] to the sound discretion of the trial judge is that the judge is in the best position to evaluate it. The judge is physically on the scene, able to observe matters not usually reflected in a cold record. The judge is able to ascertain the demeanor of the witnesses and to note the reaction of the jurors and counsel to inadmissible matters. That is to say, the judge has his finger on the pulse of the trial." *State v. Hawkins*, 326 Md. 270, 278 (1992).

### III

### Testimony Concerning Location Tracking

The second issue before us is whether expert testimony is necessary to introduce location data passively collected by "smartphones" and the ability of an individual to turn location tracking off.

At Mr. Galicia's trial, the State introduced records and elicited testimony through a witness from Google[37] concerning internet searches and location tracking conducted on Mr. Galicia's two Google accounts. There was a gap in the location tracking data in the Google account that Mr. Galicia was using at the time of the murders for a period of several

---

[37] Google LLC, a subsidiary of Alphabet, Inc., is a well-known technology company, that, among other things, operates a widely-used internet search engine, is an email service provider, and produces various consumer electronic products.

43

weeks that included the date of the crime. The witness testified that a user of a device could turn off Google's location tracking. Mr. Galicia's counsel objected to the testimony concerning both the search records and the location tracking data on the ground that the State was required to present expert testimony to admit that evidence. The trial court overruled that objection. In the end, neither the State nor the defense referred to the location tracking testimony in closing argument.

The admission of the testimony about the search and location tracking data became one of the issues in Mr. Galicia's appeal. Although the Court of Special Appeals held that it was not necessary to present expert testimony concerning the internet search records, it came to the opposite conclusion concerning the location tracking data. It held that the trial court erred in allowing a lay witness to testify about a cell phone user's ability to turn off certain location tracking functions on the phone as the court did not consider that function to be within the realm of common knowledge.

### A.    Trial Testimony and Objection

Daniel O'Donnell, a custodian of records on the legal investigation support team at Google, stated that his job was to provide user data in response to law enforcement inquiries that Google receives in the form of subpoenas, court orders, and search warrants. The State did not seek to qualify Mr. O'Donnell as an expert witness.

Mr. O'Donnell primarily introduced records of internet searches conducted from Mr. Galicia's two accounts before and after the murders. That testimony established that, during April 2017, prior to the murders, internet searches were conducted from those accounts for firearms matching those used in the shooting. One such search was conducted

44

shortly after the murders in June 2017; in closing, the State suggested that Mr. Galicia was looking to replace a weapon used in the shooting that had been discarded.[38]

Before and during Mr. O'Donnell's testimony, there were lengthy bench conferences during which Mr. Galicia's counsel argued that it was not appropriate for a lay witness to explain the contents of Google search and location history records. In defense counsel's view, Mr. O'Donnell's testimony would be based on specialized knowledge, training, and experience. The trial court ruled that Mr. O'Donnell would be allowed to testify and defense counsel could object on a question-by-question basis.

During the direct examination of Mr. O'Donnell, Mr. Galicia's counsel repeatedly objected to questions about the scope of Google's recordkeeping.[39] Defense counsel eventually requested a continuing objection, which was acknowledged by the trial court, as the State presented the data from Mr. Galicia's two Google accounts in spreadsheet form and asked Mr. O'Donnell to explain how Google compiles search and location history records. As indicated above, only the location history records are at issue before us.

The relevant portion of Mr. O'Donnell's testimony was as follows:

Q:    Is there any other types of records that Google keeps from its accountholders?

A:    Yes.

Q:    Can you tell us what else?

---

[38] The police never located any of the murder weapons.

[39] Among other things, Mr. Galicia's counsel argued that the records were not admissible under the business records exception to the hearsay rule because the records were user-generated and the custodian of records did not have a "duty to report." The court overruled this objection, likening the records to incoming and outgoing call logs about which a custodian of records from a telephone company would be allowed to testify.

45

A: It depends on the products and services that the user is registered with. It could be anything from their, the contents of their e-mails, photos that they've uploaded, their location history, if they've opted into that service.

Q: When you, now, when you say, if they've opted into that service when you said location history, can you explain what you meant by that?

A: Sure. So depending on what the product and service is, the user does have functionality to enable or disable the tracking of that data. Location history is one of those services. So a user can opt out of tracking their location history, either by device or across their Google account.

* * *

Q: So Mr. O'Donnell, what is location history data? Can you just give us an overall look at services?

A: Yes. So it is data that is collected from devices that a user has logged into with their Google account. It's taken from a number of different sources, and it's collected for business purposes to provide estimates, or geographic coordinates for where that device has been.

The State then asked Mr. O'Donnell if there was any location data from June 5, 2017 (the date of the murders), associated with either of Mr. Galicia's accounts. After consulting data from a flash drive that he had compiled for the trial, Mr. O'Donnell stated that there was a "gap" in that there were no logs for that date, although there were logs for other dates. Mr. O'Donnell also testified that the location history data associated with one account began on August 3, 2017, two months after the murders. On cross-examination, Mr. Galicia's counsel elicited testimony that the "gap" associated with the other account was a period of months. In particular, the exhibit pertaining to that account shows an absence of location data for the period between April 11, 2017 and June 8, 2017.

46

## B.     *Decision of the Court of Special Appeals*

The Court of Special Appeals devoted most of its discussion of Mr. O'Donnell's testimony to the admissibility of the search records. It concluded that the search records were properly admitted without expert testimony. 2021 WL 130513 at *33-35. However, with regard to the location tracking data, it concluded that "[h]ow and under what circumstances Google tracks location data related to searches and other activity on a device is not within the realm of common knowledge, and many laypeople would be unaware that that function can be enabled or disabled." *Id*. at *35. Accordingly, it held that a witness who testified on that subject should have been qualified as an expert.

## C.     *Analysis*

### 1.     Standard of Review

An appellate court typically reviews a trial court's ruling on the admission of evidence for abuse of discretion. *Portillo Funes v. State*, 469 Md. 438, 478 (2020). An abuse of discretion occurs where "a trial judge exercises discretion in an arbitrary or capricious manner or … acts beyond the letter or reason of the law." *Cooley v. State*, 385 Md. 165, 175 (2005). In some circumstances, the admissibility of particular evidence is a legal question, in which case an appellate court accords no special deference to a trial court. *Brooks v. State*, 439 Md. 698, 708 (2014).

The rules of evidence distinguish between the types of opinions and inferences that can be expressed by a lay witness and those for which the witness must be qualified as an expert. Lay witness opinion or inference testimony "is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful

47

to a clear understanding of the witness's testimony or the determination of a fact in issue." Maryland Rule 5-701. By contrast, "when the subject of the inference ... is so particularly related to some science or profession that is beyond the ken of the average layman," it may be introduced only through the testimony of an expert witness properly qualified under Maryland Rule 5-702. *Johnson v. State*, 457 Md. 513, 530 (2018) (citation and internal quotation marks omitted). "If a court admits evidence through a lay witness in circumstances where the foundation for such evidence must satisfy the requirements for expert testimony under Maryland Rule 5-702, the court commits legal error and abuses its discretion." *Id*.

2.     Whether the "Location History" Testimony Required an Expert Witness

The resolution of this issue essentially depends on which of two decisions of this Court is more pertinent. The State relies on *Johnson*, *supra*, while Mr. Galicia argues that an earlier decision in *State v. Payne*, 440 Md. 680 (2014), is the more appropriate precedent.

*Payne*

In *Payne*, a police detective testified about the locations of the defendants' cell phones at critical times in relation to the murder with which they were charged. The detective had collected thousands of pages of raw phone records from the cell phone service provider and then pared them down into a Call Detail Record that reflected communications to or from the defendants' phones over a two-day period. 440 Md. at 685. He used the records to compile single-page exhibits listing information relevant to each call, including the geographic coordinates of the cell towers to which the phones connected

48

during each call. *Id.* at 686. The times of the calls and locations of the cell towers were related to the time and place of the murder. Through the detective, the State entered into evidence both the single-page exhibits listing the relevant call data, as well as maps showing the pertinent cell towers in relation to the crime scene. *Id*. at 685-89.

The State did not qualify the detective as an expert witness when he testified at trial. Defense counsel objected to the detective's testimony about how he interpreted the raw phone records, arguing that only an expert witness could interpret that data. 440 Md. at 685-89. In preliminary questioning conducted outside the presence of the jury, the detective testified that his procedure required "matching certain data points associated with a cell phone call to a table available on an unnamed 'secure Web site' or on 'an Excel spread sheet that comes with the records,' to determine the latitude and longitude of the corresponding cell tower." *Id.* at 686-87. Neither the secure web site nor the Excel spreadsheet was entered into evidence. The trial court overruled the defense objection and allowed the detective to testify without being qualified as an expert. *Id*. at 687.

This Court reversed the conviction. In doing so, the four-judge majority opinion concluded that the detective had "engaged in a process . . . that was beyond the ken of an average person" and offered conclusions regarding the communication path of calls that required expert qualification. 440 Md. at 700. The majority opinion rejected the State's argument that a lay person with the same information and instructions could have determined the locations of the cell towers, concluding that "additional training and experience were required to parlay the process from which [the detective] derived the communication path of each call." *Id*. at 700-01. A Call Detail Record "contains a string

49

of data unfamiliar to a layperson and is not decipherable based on 'personal experience[,]'" so the detective had to rely on specialized knowledge or experience to eliminate extraneous data and isolate the pertinent calls. *Id.* at 701. The Court contrasted the Call Detail Records with "entries typical of a cell phone bill where a juror could 'rely upon his or her personal experience' to understand their meaning." *Id.*

*Johnson*

In *Johnson*, the Court held that a custodian of records for the Maryland Transit Administration ("MTA") police did not need to be qualified as an expert in order to testify regarding the times and locations recorded by a mobile GPS tracking device used by the defendant, who was an MTA police officer at the time of the offense. 457 Md. 513. The device, known as a "Pocket Cop," generated a report showing its location at specific times and the duration of time spent at each location. *Id.* at 521. The custodian of records, who was also an MTA police supervisor, explained the basic function of the device and testified to the contents of two entries from the report, which showed how long the defendant had spent at two locations related to the crime. *Id.* at 526.

The Court noted that trial courts frequently admit business records through witnesses who are not experts in the technology that produced those records. "Expert testimony about how a clock works is not necessary every time an employee's timesheet is offered into evidence. The same is true for GPS entries." 457 Md. at 532; *see also Gross v. State*, 229 Md. App. 24, 36 (2016) (expert testimony not necessary to admit GPS location data where the witness simply read the GPS data as it appeared in the records).

50

The Court distinguished the MTA police GPS records that were the subject of the police supervisor's testimony from the telephone company Call Detail Records that were the subject of the detective's testimony in *Payne*. The holding in *Payne* specifically concerned the process that the detective had used to glean relevant location evidence from records that had not been created for that purpose and that were not decipherable by a lay person. "[T]he detective was not simply reciting information from the business records, but applying specialized knowledge to translate the voluminous records into something the jury could understand." *Johnson*, 457 Md. at 534. Even when testimony does not constitute an opinion, "an expert [is] needed to explain the process for attaching significance to data that would not be *comprehendible* by a lay person." *Id.* at 535 (emphasis added). By contrast, in *Johnson*, the GPS records had been created to track the locations of officers, the police supervisor read the entries as they appeared in the report, and the content of that report was not beyond the comprehension of the average juror. *Id.*

*Application to the Location Tracking Records in this Case*

In the time since *Payne* was decided, almost eight years ago, and *Johnson* was decided, more than four years ago, smartphones[40] have become ever more ubiquitous and the location tracking capabilities of those devices and their applications (or "apps") ever more familiar. Smartphone ownership among American adults grew from 35% in 2011 to

---

[40] Merriam-Webster defines "smartphone" as "a cell phone that includes additional software functions (such as email or an Internet browser)." *Smartphone*, Merriam-Webster, https://www.merriam-webster.com/dictionary/smartphone (2022), available at perma.cc/TKD4-CJ4T.

85% in 2021, and ownership among adults aged 18-49 is greater than 95%.[41]  While few could explain the technology used by phones and the network of towers and satellites with which they constantly communicate, the fact that they collect data about users' habits, including location, is widely understood: "A cell phone's identification of its location is one of its essential virtues.  A cell phone must be found by a service provider for it to be used as a phone." *State v. Copes*, 454 Md. 581, 587 (2017).  There has been, and will continue to be, much debate over which aspects of this pervasive yet rapidly evolving technology are within the common knowledge.  The question currently before us, however, concerns not so much the technology behind location tracking, but rather the understanding that a user may exercise some control over this feature and the data that it generates.

Even had location tracking technology – and the average person's familiarity with it – stood still over the past decade, this case is plainly closer to the simple recitation of the data exemplified in *Johnson* than it is to the interpretive process at issue in *Payne*.  The location tracking records introduced during Mr. O'Donnell's testimony were the data generated by Google's standard recordkeeping practices; it is evident that he used no specialized skill to reformat or translate any of the raw data.  Mr. Galicia argues that the records were not self-explanatory, and that Mr. O'Donnell had to decipher the categories of information in those records.  However, the gap in the chronological listing is obvious in the exhibit.  The more significant issue is whether Mr. O'Donnell relied on specialized

---

[41] Mobile Fact Sheet, Pew Research Center (Apr. 7, 2021), https://www.pewresearch.org/internet/fact-sheet/mobile/, available at perma.cc/6TUE-2DA4.

knowledge in explaining that a user has the ability to enable or disable the tracking of that data, thereby ascribing significance to that gap.

Google's location history tracking is a consumer feature designed to be understood and managed by accountholders. When a court considers whether testimony is beyond the "ken" of the average layman, the question is not whether the average person is already knowledgeable about a given subject, but whether it is within the range of perception and understanding. "Testimony elicited from an expert provides useful, relevant information when the trier of fact would not otherwise be able to reach a rational conclusion; such information 'is not likely to be part of the background knowledge of the judge or jurors themselves.'" *Payne*, 440 Md. at 699, quoting David H. Kaye, et al., *The New Wigmore: Expert Evidence* §1.1 (2d ed. 2010). Some smartphone users – and the minority of Americans who do not own smartphones – may not personally have experience toggling their location tracking on and off, but the simple fact that a mobile electronic device allows its users to customize the data they share with the manufacturer, the cell phone service provider, and various apps is common knowledge in modern society. That a user's customized or default settings may impact the records kept by those entities does not require specialized knowledge to understand.

Mr. Galicia argues that Google's recordkeeping is so "opaque" as to be beyond the understanding of a lay person. The evidence that he cites for this proposition references news reports of Google continuing to record location data through a user's "Web and App Activity" – a separate category of data recorded by Google – even when the user has

53

manually disabled "Location History" tracking.[42]   That *more* user location data may be recorded *elsewhere* on one's phone is not relevant to the narrow issue before the Court; Mr. Galicia does not argue that Google's data collection practices make the "Location History" record any less intuitive.

Mr. O'Donnell's statement that a user can opt out of location history tracking was properly within the scope of lay witness testimony under Maryland Rule 5-701.   The inference that this testimony was intended to help the jury draw – that Mr. Galicia could have manually disabled location tracking around the time of the murders – was well within the understanding of the average lay person.

## IV

## Conclusion

For the reasons set forth above, we hold:

(1)   The trial court did not abuse its discretion when it declined to allow Mr. Galicia's counsel to elicit on cross examination of Ms. DaSilva an out-of-court statement allegedly made by Mr. Garcia-Gaona that inculpated his younger brother in the shooting.

(2)  The witness who introduced records from Google concerning Mr. Galicia's two accounts need not have been qualified as an expert to testify that an account holder has the ability to turn off a location tracking function associated with those accounts.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED.  COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

---

[42] Ryan Nakashima, *AP Exclusive: Google tracks your movements, like it or not*, AP (Aug. 13, 2018), https://apnews.com/article/north-america-science-technology-business-ap-top-news-828aefab64d4411bac257a07c1af0ecb.

IN THE COURT OF APPEALS

OF MARYLAND

No. 5

September Term, 2021

_____

STATE OF MARYLAND

v.

RONY GALICIA

_____

\*Getty, C.J.
\*McDonald
Watts
Hotten
Booth
Biran
Raker, Irma S. (Senior Judge,
Specially Assigned),

JJ.

_____

Dissenting Opinion by Watts, J., which Raker,
J., joins.

_____

Filed: June 27, 2022

\*Getty, C.J., and McDonald, J., now Senior
Judges, participated in the hearing and
conference of this case while active members of
this Court.  After being recalled pursuant to Md.
Const., Art. IV, § 3A, they also participated in
the decision and adoption of this opinion.

Respectfully, I dissent. In this case, in the Circuit Court for Montgomery County, a jury found Rony Galicia, Respondent, guilty of two counts of first-degree murder and other crimes related to the brutal murder of two victims on the evening of June 5, 2017. At a joint trial of Galicia and co-defendants, the State offered testimony of Luz DaSilva, the former girlfriend of co-defendant Edgar Garcia-Gaona. On direct examination, in response to a question about what transpired on the night of the murder, DaSilva testified that Garcia-Gaona told her that "that day he took the cellphone from the boys, smashed it, and then after they just started shooting them." The State's case theory was that all of the co-defendants were present at the scene of the murder and shot the victims. Galicia disputed being present at the scene and any involvement in the shooting, insisting that he was at home watching Netflix.

Against this backdrop, the case involves two errors by the circuit court that require reversal. First, the circuit court erred in limiting the ability of Galicia to cross-examine DaSilva when she testified that, days after the murders in the case, Garcia-Gaona told her that "they just started shooting them." Garcia-Gaona was one of four co-defendants, along with Galicia, Jose Ovilson Canales-Yanez, and Garcia-Gaona's half-brother Roger Garcia, who is also known as "Johann." DaSilva's testimony about Garcia-Gaona's use of the word "they" made it unclear to the jury which of the other three co-defendants he was referring to and unfairly prejudiced Galicia.

Underlying the prejudice concerning DaSilva's testimony is that when being interviewed by a detective, DaSilva advised that Garcia-Gaona implicated Roger Garcia in the murder by saying that "he was surprised that his little brother took out a gun and just

shot them guys, too" and saying "[t]hat his brother[] Johan[n] took out the gun too and just shot the guys as well." DaSilva also advised the detective that Garcia-Gaona implicated Canales-Yanez by saying that Garcia-Gaona sold a gun to Canales-Yanez before the murders and that Garcia-Gaona and Canales-Yanez traveled together in Canales-Yanez's wife's vehicle on the date of the murders. DaSilva's statements to the detective during the interview about Garcia-Gaona's implicating Roger Garcia and Canales-Yanez indicate that, when DaSilva testified that Garcia-Gaona said that "they just started shooting them[,]" he (Garcia-Gaona) was not in actuality referring to Galicia at all.

The circuit court, however, precluded Galicia from cross-examining DaSilva about Garcia-Gaona's use of the word "they" and about his statements implicating Roger Garcia and Canales-Yanez. From my perspective, Galicia had a right under the Sixth Amendment's Confrontation Clause and Article 21 of the Maryland Declaration of Rights to cross-examine DaSilva about the matter because DaSilva's testimony that Garcia-Gaona said that "they just started shooting them" plainly could have been understood by the jury as implicating Galicia. In addition, Garcia-Gaona's statements implicating Roger Garcia and Canales-Yanez were admissible and would have indicated that Galicia was not one of the shooters.

The next issue concerns the testimony of Daniel O'Donnell, a Google records custodian, offered against Galicia. The State did not attempt to qualify O'Donnell as an expert witness, but O'Donnell was allowed to testify regarding Galicia's Google account "location history" data, and testified that there was a "gap" in Galicia's location history, which corresponded to the date of the murder. The circuit court's second error was

- 2 -

allowing O'Donnell to testify as a lay witness that there was a "gap" in the "location history"[1] of Galicia's Google account on the date of the murders. Maryland Rules 5-801 and 5-802 "prohibit the admission as 'lay opinion' of testimony based upon specialized knowledge, skill, experience, training or education." Ragland v. State, 385 Md. 706, 725, 870 A.2d 609, 620 (2005).

Because the State has not proven beyond a reasonable doubt that either of the errors described above was harmless, I would affirm the judgment of the Court of Special Appeals, which issued a thorough and well-reasoned opinion in which it reversed Galicia's convictions and remanded the case for a new trial.

With certainty, the circuit court should have allowed Galicia to cross-examine DaSilva about Garcia-Gaona's use of the word "they." The Confrontation Clause of the Sixth Amendment and Article 21 of the Maryland Declaration of rights enshrine the right of a criminal defendant to cross-examine witnesses. See Manchame-Guerra v. State, 457 Md. 300, 309, 178 A.3d 1, 6 (2018). To safeguard this right, a circuit court must "allow the defense a 'threshold level of inquiry' that puts before the jury 'facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.'" Id. at 309, 178 A.3d at 6 (citations omitted). Within the contours of the subjects discussed on direct examination, a defendant "should be free to

---

[1]O'Donnell testified, among other things, that "location history" "is data that is collected from devices that a user has logged into with their Google account. It's taken from a number of different sources, and it's collected for business purposes to provide estimates, or geographic coordinates for where that device has been." According to O'Donnell, a person with a Google account "can opt out of tracking their location history, either by device or across their Google account."

cross-examine in order to elucidate, modify, explain, contradict, or rebut testimony given in chief." Smallwood v. State, 320 Md. 300, 307, 577 A.2d 356, 359 (1990) (citations omitted). In this case, given that DaSilva's testimony plainly could have been understood to implicate him, Galicia had a right under the Confrontation Clause to ask DaSilva to explain what she meant when she testified on direct examination that Garcia-Gaona told her that "they just started shooting them." At a minimum, Galicia's counsel should have been allowed to ask DaSilva whether Garcia-Gaona ever mentioned him while making inculpatory statements to her.[2]

Galicia should have also been allowed to elicit from DaSilva Garcia-Gaona's statements implicating Roger Garcia and Canales-Yanez, which were admissible under the "statement against penal interest" exception to the rule against hearsay under Maryland Rule 5-804(b)(3). The circumstances of this case satisfy all three requirements for that hearsay exception. First, as the State acknowledges on brief, "the declarant"—i.e., Garcia-Gaona—was "unavailable as a witness[.]" Md. R. 5-803(b). Second, Garcia-Gaona's statements implicating Roger Garcia and Canales-Yanez "so tended to subject [Garcia-

---

[2]I am unpersuaded by the State's reliance on State v. Rosado, 39 A.3d 1156 (Conn. App. 2012) for the proposition that Galicia was improperly attempting to use Garcia-Gaona's failure to mention him as evidence that he was not involved. Unlike Rosado, id. at 1165, this case does not involve a defendant who sought to treat as exculpatory the circumstance that a declarant did not mention the defendant by name when describing events that the declarant witnessed. Nor does this case involve a defendant who attempted to introduce evidence of the "absence of a statement" as an exception to the hearsay rule, i.e., under a hearsay exception, as evidence that he was not involved in the charged offense. Instead, this case involves a defendant who sought to prevent a hearsay statement from inculpating him by asking on cross-examination whether the declarant was referring to him when the declarant used the word "they."

Gaona] to . . . criminal liability . . . that a reasonable person in [his] position would not have made the statements unless the person believed them to be true." Md. R. 5-804(b)(3). And finally, "corroborating circumstances clearly indicate the trustworthiness of the statement[s]." Id.[3]

Garcia-Gaona's statements implicating Roger Garcia and Canales-Yanez were self-inculpatory and a reasonable person in his position would not have made the statements unless the person believed them to be true. By indicating that he had seen the murders, Garcia-Gaona admitted to DaSilva he was at the murder scene at the time. Even more significantly, Garcia-Gaona admitted to DaSilva that he participated in the murders. DaSilva told the detective that Garcia-Gaona "was, like, but all that matters is that we already got it done and it happened just like the movies. You know that we just went over there quick as s[***] and just got them and then that was it." As far as DaSilva's statements to the detective reveal, at no point did Garcia-Gaona deny participating in the murders or indicate that his participation in the murders differed from that of any of the other three co-defendants. In other words, unlike the declarant who made a self-serving statement in Jackson v. State, 207 Md. App. 336, 358, 52 A.3d 980, 992, cert. denied, 429 Md. 530, 56 A.3d 1242 (2012), Garcia-Gaona did not attempt to deflect guilt from himself to someone

---

[3]Although Garcia-Gaona's statements implicating Roger Garcia and Canales-Yanez were hearsay within hearsay because they were contained within DaSilva's statements to the detective, the State does not contend that Garcia-Gaona's statements implicating Roger Garcia and Canales-Yanez were inadmissible on the ground that no hearsay exception applied to DaSilva's statements to the detective.

else.[4]

Multiple corroborating circumstances indicated the trustworthiness of Garcia-Gaona's statements implicating Roger Garcia and Canales-Yanez. Just days after the murders, Garcia-Gaona confessed to DaSilva—his girlfriend and the mother of his children—in the home that they shared. Garcia-Gaona was not in custody and confessing to law enforcement officers in an attempt to curry favor with them. Unlike the defendant's father who was ostensibly lying to protect his son in Stewart v. State, 151 Md. App. 425, 455, 827 A.2d 850, 868 (2003), cert. denied, 377 Md. 276, 833 A.2d 32 (2003), Garcia-Gaona did not try to protect any of the other co-defendants. To the contrary, when talking to DeSilva, Garcia-Gaona implicated two of the other co-defendants, one of whom is his half-brother. In addition, DaSilva told the detective that "they set them up. They had that plan already up. I know it was through Snapchat that they did that." DaSilva also told the detective that Garcia-Gaona said that "they took their phone, they crushed it, whatever, you know, they probably smashed it or whatever the type of way they did it." These statements are consistent with the State's theory of the case, and the evidence offered by the State, that Roger Garcia lured one of the victims to the murder scene using Snapchat messages and

---

[4]Also unpersuasive is the State's contention that Garcia-Gaona's statements implicating Roger Garcia and Canales-Yanez were not statements against penal interest because a reasonable person in Garcia-Gaona's position would not have believed that law enforcement officers would obtain Snapchat messages that linked Roger Garcia to the murders. Nothing in the plain language of Maryland Rule 5-804(b)(3) states or implies that, for a statement to be against penal interest, a reasonable person in the declarant's position would have believed that the person would eventually get caught. Instead, what is required is "that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." Md. R. 5-804(b)(3).

that the murderers smashed that victim's phone to destroy evidence of those messages.

The State has not met its burden to prove beyond a reasonable doubt that the circuit court's error was harmless. Garcia-Gaona's statement that "they just started shooting them" clearly implicated Galicia. In the absence of any clarification on cross-examination about Garcia-Gaona's use of the word "they," it cannot be said beyond a reasonable doubt that his statement did not affect the jury's decision to find Galicia guilty. The circuit court's preliminary advice to the jury, prior to opening statements, that some evidence might be admitted as to one or more but not all of the defendants and that, if so, the court would provide a limiting instruction, was not a substantive instruction, was necessarily provided before the presentation of evidence in the case, and could have in no way caused the jury to consider the statement "they just started shooting them" as not implicating Galicia. Likewise, the circuit court's limiting jury instruction that DaSilva's testimony regarding Garcia-Gaona's statement "was offered only against [him] and not against the others" did not cure the prejudice. In the context of a joint trial, limiting instructions are at times unable to cure prejudice. See Gray v. Maryland, 523 U.S. 185, 188 (1998). In this case, the circuit court's limiting instruction did not include an explanation that the word "they" did not include or pertain to Galicia. As such, the limiting instruction did not cure the prejudice resulting from the circuit court's error because the instruction ran the risk of drawing more of the jury's attention to Garcia-Gaona's statement and could reasonably have been interpreted by the jury to mean that, although the "they" referred to in Garcia-Gaona's statement included Galicia, the jury should not consider the circumstance. Clearly, this would have been a difficult instruction for any juror to have followed.

As to the second issue, it was error to allow O'Donnell, a lay witness, to give testimony that only an expert could properly provide—namely, that there was a "gap" in the "location history" of Galicia's Google account on the date of the murders. O'Donnell's inference that there was a "gap" in the "location history" was not "rationally based on [his] perception"—*i.e.*, what he saw or heard. Md. R. 5-701. Instead, the inference was based on O'Donnell's understanding of the "location history" data based on his specialized knowledge and training as an employee of Google.

An average member of the general public would not have the specialized knowledge and training necessary to identify and explain a gap in the "location history" of a Google account—and has likely never even heard of "location history"—to say nothing of being able to discern that there is a "gap" in a user's "location history" just by looking at data from Google. Interpreting such data is nothing like looking at "commonly used devices such as clocks, scales, and thermometers." Johnson v. State, 457 Md. 513, 531, 179 A.3d 984, 994 (2018). When one looks at a clock, scale, or thermometer, there is no need to draw an inference—the device says what it means and means what it says. By contrast, when one looks at "location history" data from Google, only by having specialized knowledge or training could one draw an inference could that there is a "gap" in the data. A gap in location history data from Google and an explanation for the gap would not be obvious to a layperson.

In other words, understanding how to evaluate Google "location history" data is a matter that is not within the purview of the general public, and only a properly qualified expert witness could draw such an inference. As the Court of Special Appeals determined,

"[h]ow and under what circumstances Google tracks location data related to searches and other activity on a device is not within the realm of common knowledge, and many laypeople would be unaware that that function can be enabled or disabled." Galicia v. State, No. 3350, Sept. Term, 2018, 2021 WL 130513, at *35 (Md. Ct. Spec. App. Jan. 14, 2021). The Court of Special Appeals determined that through testimony that a gap existed in Galicia's location history, the State was trying to show that he had disabled it himself, and that expert testimony was required to "elucidate how and when that data is stored; how a user enables and disables location tracking; and whether gaps can be explained by other circumstances beyond disabling location tracking." Id. And, I agree. "[B]ecause the technology that resulted in the ['location history' data] exceeds what is generally available to and understood by the public, expert testimony was required under the circumstances of this case to explain the [data]." Id. at 538, 179 A.3d at 998 (Watts, J., dissenting).

I am unpersuaded by the State's assertion that the circuit court's error in allowing O'Donnell's testimony was harmless because Detective Michael Miglianti—an expert for the State in the field of digital forensics—testified that there was a gap in the call logs and text messages on Galicia's phone on the date of the murders and that the most likely explanation was that they were deleted. Detective Miglianti did not testify about the alleged "gap" in the "location history" of Galicia's Google account. O'Donnell's testimony concerning the alleged "gap" in the location history of Galicia's Google account was far more inculpatory than testimony regarding the gap in the call logs and text messages on Galicia's phone because the alleged "gap" in the "location history" of Galicia's Google account meant that a method of ascertaining his whereabouts on the date

of the murders had been eliminated. Although a person may decide to delete call logs or text messages for any number of reasons, an alleged decision to turn off the "location history" of a Google account for a day could be interpreted as an indication that the person did not want others to know where the person was that day and as an act indicating a consciousness of guilt.[5] As such, it cannot be established beyond a reasonable doubt that allowing O'Donnell to testify as a lay witness that there was a "gap" in the "location history" of Galicia's Google account had no effect on the outcome of the case and was harmless error.

For the above reasons, respectfully, I dissent.

Judge Raker has authorized me to state that she joins in this opinion.

---

[5]Although a DNA witness for the State testified that Galicia was a contributor of DNA found on shell casings recovered from the location of the shooting and the expert opined that it was possible to transfer DNA to a firearm cartridge when loading a firearm, the expert's testimony did not establish Galicia's presence at the scene of the shooting. Thus, O'Donnell's testimony concerning a gap in Galicia's Google location history and DaSilva's unexplained testimony that "they just began shooting" was highly prejudicial in that it could have been interpreted by the jury as not only linking Galicia to the scene, but also as incriminating him as one of the shooters and as evidence of consciousness of guilt.